Joseph L. MAGGIO, Plaintiff,
Appellant,

v.

GERARD FREEZER & ICE CO., et al.,
Defendants, Appellees.

No. 86–2103.

United States Court of Appeals,
First Circuit.

Argued April 8, 1987.

Decided July 15, 1987.

Alexander Whiteside with whom Putnam, Bell & Russell, Boston, Mass., was on brief, for plaintiff, appellant.

Joseph L. Cotter with whom Margaret R. Hinkle, Paula M. Bagger and Goodwin, Procter & Hoar, Boston, Mass., were on brief, for defendant, appellee Gerard Freezer and Ice Co.

Michael D. Weisman with whom Robert D. Richman and Hill & Barlow, Boston, Mass., were on brief, for defendants, appellees Candeloro J. Maggio, Jr. and Peter R. Maggio.

Before COFFIN, Circuit Judge, MALETZ,* Senior Judge, and TORRUELLA, Circuit Judge.

COFFIN, Circuit Judge.

Plaintiff-appellant Joseph Maggio challenges a district court award of summary judgment in favor of Gerard Freezer & Ice Company ("Gerard Freezer") and several individual defendants.[1] The court held that plaintiff's complaint, which alleges violations of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), Rule 10b–5, 17 C.F.R. § 240.10b–5, breach of fiduciary duty, and common law fraud, is barred by the applicable statute of limitations, Mass.Gen.L. ch. 260, § 2A.[2] As he did before the district court, plaintiff argues on appeal that the action was timely, because the statute of limitations should not have begun to run until the date in 1985 when plaintiff discovered certain documents that put him on notice of his claims.

## I. *Factual Setting.*

Plaintiff Joseph Maggio is the son of Candeloro J. Maggio, Sr. ("Candeloro, Sr."), who founded Gerard Freezer & Ice Company with his three brothers in 1948. In 1964, Candeloro, Sr. learned that he was dying of cancer and began to make arrangements for the passing of corporate control to his three sons. At the time, he controlled 56 of the 152 outstanding shares of Gerard Freezer stock. His brothers, Leo Maggio and Peter Maggio, each owned 48 shares. On August 10, 1964, Candeloro, Sr. transferred twenty shares of Gerard Freezer stock, giving four shares each to his brothers Leo and Peter (increasing their holdings to 52 shares each) and twelve shares to his nephew, Roger Chomko. On the same day, he executed a will leaving his 36 remaining shares to be held in trust by his brother Leo for distribution to plaintiff and his two brothers, Candeloro, Jr. and Peter R. Maggio, when plaintiff, the youngest, attained twenty-five years of age.

Also on August 10, 1964, the recipients of the stock transfers—Leo Maggio, Peter Maggio, and Roger Chomko—entered agreements with Gerard (the "1964 Stock Repurchase Agreements") providing that Gerard would repurchase all of their stock upon death or termination of employment

---

* Of the United States Court of International Trade, sitting by designation.

**1.** There are two distinct groups of individual defendants, most of whom are relatives of the plaintiff and former shareholders of the corporate defendant. The first group consists of Peter Maggio (plaintiff's uncle); Carrie Maggio (plaintiff's aunt); Robert Sullivan, as trustee under the will of Leo Maggio (plaintiff's deceased uncle); Mary Maggio (plaintiff's aunt); Antonio F. Iovino (Gerard's company counsel); and Roger Chomko (plaintiff's cousin), both individually and as executor of Leo Maggio's estate. These defendants share a community of interest with Gerard Freezer and have been consistently represented by the same counsel as the corporate defendant. Plaintiff's brothers, Candeloro J. Maggio, Jr. ("Candeloro, Jr.") and Peter R. Maggio ("Peter R.") comprise the second group of individual defendants. Both brothers are former minority shareholders who, in 1981, commenced litigation that eventually resulted in Gerard Freezer's liquidation and dissolution. Throughout the current litigation, they have been represented by separate counsel and have filed separate motions and briefs.

**2.** For cases arising prior to January 1, 1974, the prescribed limitations period is two years. For cases arising on or after January 1, 1974, the limitations period is three years. Mass.Gen.L. ch. 260, § 2A. The 1973 amendment extending the limitations period has no substantive effect on our disposition of this case, so throughout the opinion, for the sake of convenience, we assume that the new, longer period applies.

at a fixed price aggregating to $135,000.[3] By virtue of these agreements, Gerard Freezer also gained the right to purchase the shares at the same fixed price in the event of a proposed sale to a third party. Under the 1964 Stock Repurchase Agreements, therefore, the 36 shares held in trust for distribution to plaintiff and his two brothers were intended to represent 100 percent of Gerard Freezer's stock at some point in the future. In 1968, however, Gerard Freezer issued 50 new shares of stock, 25 each to plaintiff's uncles, Leo Maggio and Peter Maggio.

The event that forms the basis for plaintiff's claims in this litigation occurred in April, 1972, after Leo Maggio had released the 36 shares previously held in trust for plaintiff and his brothers. Gerard Freezer offered to purchase plaintiff's twelve shares in exchange for a payment of $30,000. Ignoring the advice of family members, plaintiff immediately accepted this offer and transferred his shares to the corporation. Plaintiff now contends, however, that this offer and transaction was part of a fraudulent scheme by certain of the individual defendants to gain control of the corporation. Under the terms of the 1964 Stock Repurchase Agreements, plaintiff's twelve shares would eventually have grown to represent not a meager six percent interest in the corporation, as in 1972, but one-third of Gerard Freezer's outstanding stock. In addition, the fixed prices set by the 1964 agreements ensured that the corporation's capital would not be significantly diminished by the repurchase of the shares. Plaintiff maintains that the defendants' failure to disclose the existence of the 1964 agreements left him ignorant of the enhanced value of his shares and, hence, vulnerable to the scheme.

Although plaintiff seeks relief for transgressions allegedly committed in 1972, he neglected to commence this action until September, 1985. He seeks to justify this thirteen year delay by contending that he was completely unaware of his claim until November, 1983, when he first learned of the existence of the 1964 Stock Repurchase Agreements, and not actually on notice of his claim until May, 1985, when he discovered copies of the 1964 Stock Repurchase Agreements in the record of a lawsuit brought by his brothers against the corporation four years earlier. His position in response to defendants' limitations defense, therefore, is that his action did not accrue (or that the statute of limitations was tolled) until he found, or at least became aware of, the 1964 agreements.

The district court nevertheless granted defendants' renewed motion for summary judgment on November 7, 1986, resting its decision on alternative grounds. First, the court held that plaintiff's response to defendants' summary judgment motion did not conform to the requirements of District of Massachusetts Local Rule 18, which requires "a concise statement" of the disputed material facts together with references to the record. This failure led the court to treat as undisputed every fact listed in defendants' Local Rule 18 filing and to rule that, on those facts, plaintiff's action was barred by the statute of limitations. Second, the court held that, even considering only the facts expressly admitted by plaintiff, and construing those facts in the light most favorable to the plaintiff, no reasonable factfinder could find that plaintiff had commenced his action in a timely fashion. Having reviewed the materials presented to the district court, we fully agree with this second, broader conclusion and therefore have no occasion to address the dispute concerning the interpretation of Local Rule 18.

## II. *Propriety of Summary Judgment.*

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Both sets of defendants filed statements of undisputed material facts with the district court to accompany their renewed motions

---

**3.** This total reflects fixed prices of $60,000 for Leo's 52 shares, $60,000 for Peter's 52 shares, and $15,000 for Roger Chomko's 12 shares.

for summary judgment. Plaintiff, however, did not respond by formally challenging the defendants' statements of facts. Instead, he first restated the "essential elements" of each fact identified by defendants as follows:

(a) Plaintiff understood that it had been his father's intention that his uncles' stock would be returned to Gerard Freezer following their deaths, and that control of the company would pass to the plaintiff, his brothers and their cousin, Roger Chomko;

(b) Plaintiff's brother Candeloro objected in 1968 that proposed issuances of new shares to his uncles would upset his father's plans;

(c) In 1972, plaintiff attended a meeting at which the shareholders discussed repurchase agreements covering all of the company's stock, pursuant to which the purchase price of plaintiff's shares would be $50,000;

(d) Certain of the defendants, including Leo Maggio, Peter Maggio, Candeloro Maggio, Jr., and Antonio Iovino, told plaintiff that he should not sell his Gerard Freezer shares;

(e) Plaintiff learned that his brother Candeloro was displeased about certain stock issuances as being contrary to their father's intentions;

(f) Plaintiff learned that his brothers had filed a lawsuit, and understood it to relate, among other things, to stock issuances that had been made contrary to his father's intentions;

(g) Plaintiff did not attempt to learn how his father's plans had been memorialized until May, 1985.

Plaintiff then admitted that he did not dispute any of these facts as recharacterized in his memorandum.

Even assuming that plaintiff's differences with defendants' initial version of these facts were sufficient to place certain issues in dispute, these disputed facts would preclude an award of summary judgment only if they were also material to the issue of whether the statute of limitations bars plaintiff's action. In his supplementary memorandum in opposition to defendants' renewed motions for summary judgment, plaintiff has essentially cited four factual differences that could be viewed as genuine issues of fact.[4] We therefore consider below the materiality of each of these potential factual disputes.

First, plaintiff disagrees with defendants' characterization of his knowledge of the 1968 stock issuance. Plaintiff admits hearing his brother voice disapproval of the stock issuance on the ground that it violated his father's intentions. He also admits participating in family conversations between 1972 and 1981 regarding whether his father's wishes had been compromised by the stock issuance. He claims, however, that defendants' version of these two facts improperly attributes to him the knowledge that the intentions violated by the 1968 stock issuance concerned the future control of Gerard, and thus the value of his stock. Plaintiff contends he knew only that the stock issuance was thought to violate his father's intentions for some unspecified reason relating to the ownership of Gerard Freezer as he had left it. In our view, this distinction—even if it amounts to a genuine factual dispute—is wholly immaterial. Plaintiff has explicitly admitted knowing that his father intended for control of the company to pass to plaintiff, his brothers, and his cousin. It makes no difference, therefore, if he was mistaken as to his brother's precise motivation for complaining about the stock issuance or his family's exact reason for believing that the issuance violated his father's intentions. The important fact for determining when plaintiff should have been aware of his claim is that plaintiff, while on notice of his father's plan regarding future control of Gerard Freezer, learned that his brother and several other family members believed the 1968 stock issuance to be contrary to his father's intentions. Plaintiff concedes this much. *See infra* pp. 128–29.

4. Plaintiff also listed six pages of what he now refers to as "additional material facts." Even accepted as true and viewed in the light most favorable to plaintiff, these "additional" facts do not warrant a different result than we reach here.

Second, plaintiff takes issue with the statement by defendants to the effect that plaintiff knew his uncles' shares "had to be sold" back to the corporation following their deaths. Plaintiff insists that, until 1983, he was unaware of any legally binding agreement mandating such a stock repurchase. Until that time, according to plaintiff, he believed only that there was an "understanding" that such a sale would occur. Again, while this factual dispute may be genuine, it is not material to the limitations defense raised by defendants. As will become apparent in our analysis of the legal issues presented in this case, plaintiff's admitted knowledge of the existence of an understanding regarding his uncles' shares was, in the context of this case, enough to require him to undertake a reasonably diligent inquiry into the details of such understanding and the possibility of fraud. *See infra* pp. 128–29.

Third, plaintiff complains that defendants are not entirely correct when they state that they "attempted to convince" plaintiff not to sell his stock in 1972 "because it was worth more" than $30,000. Plaintiff maintains that he was told only to refrain from selling his shares because it would be beneficial to hold out for the $50,000 offer under consideration by the corporation at the time. He contends further that defendants withheld the important information contained in the 1964 Stock Repurchase Agreements that could have convinced him not to sell his shares for $30,000. This factual dispute, while potentially genuine, is also immaterial to the issue before us. The crucial fact for the purposes of the limitations issue is that four of the defendants advised plaintiff not to sell his shares for the price offered by Gerard Freezer. This fact, even as recharacterized by plaintiff, is patently inconsistent with plaintiff's ultimate decision to accept the corporation's offer without conducting further inquiry into either the value of his shares or the possibility that the repurchase offer was fraudulent. *See infra* pp. 128–29.

Finally, plaintiff contests defendants' statement that he had attended a meeting in 1972 at which "new" stock repurchase agreements were discussed. Although plaintiff admits attending a 1972 shareholders meeting regarding the repurchase agreements, he denies knowing that the agreements under consideration were "new" or that there were "old" repurchase agreements already in existence. This dispute is also not material to the limitations issue because, as we will demonstrate, plaintiff, based on all the other facts within his knowledge, should have discovered the information contained in the 1964 Stock Repurchase Agreements long before 1983. *See infra* pp. 128–29.

Because none of the potential factual disputes identified by plaintiff are material to the issue at stake in this case, we believe that the first prong of Rule 56—that there be no genuine issues of material fact—is satisfied in this instance. We now must determine whether the undisputed facts are sufficient to hold, as a matter of law, that plaintiff's action is barred by the applicable statute of limitations. Our discussion focuses first on plaintiff's federal law causes of action, then on plaintiff's state law causes of action.

### III. *Accrual of the Federal Claims.*

Plaintiff's federal claims, premised on violations of the Securities Exchange Act and Rule 10b–5, are governed by the Massachusetts statute of limitations for certain personal tort actions, Mass. Gen.L. ch. 260, § 2A. *See supra*, p. 124 & note 2; *General Builders Supply Co. v. River Hill Coal Venture*, 796 F.2d 8, 11 n. 3 (1st Cir.1986) (citing *Cook v. Avien, Inc.*, 573 F.2d 685, 694 (1st Cir.1978)). Federal common law, however, determines when the statute begins to run for such claims and when the statute is tolled. *Cook*, 573 F.2d at 694. As we said in *Cook:*

> Under federal law, the doctrine of fraudulent concealment operates to toll the statute of limitations "where the party injured by the fraud remains in ignorance of it *without any fault or want of diligence or care on his part* ... until the fraud is discovered, though there be no special circumstances or efforts on the part of the party committing the

fraud to conceal it from the knowledge of the other party." *Bailey v. Glover*, 88 U.S. (21 Wall.) 342, 348, 22 L.Ed. 636 (1875) (footnote omitted).... Even without affirmative acts on the part of defendants, then, a federal cause of action will accrue at the time when plaintiff *in the exercise of reasonable diligence* discovered or should have discovered the fraud of which he complains.

*Id.* at 694–95 (emphasis supplied). In other words, "storm warnings" of the possibility of fraud trigger a plaintiff's duty to investigate in a reasonably diligent manner, *Cook*, 573 F.2d at 697, and his cause of action is deemed to accrue on the date when he *should have discovered* the alleged fraud. *General Builders Supply*, 796 F.2d at 11. We have recently emphasized, moreover, that whether a plaintiff should have discovered the fraud "is an objective question" requiring the court to "determine if the plaintiff possessed such knowledge as would alert a reasonable investor to the possibility of fraud." *Id.* at 11 (citing *Hupp v. Gray*, 500 F.2d 993, 997 (7th Cir.1974)). In contrast, the determination of whether a plaintiff actually exercised reasonable diligence requires a more subjective inquiry focusing upon the circumstances of the particular case, including the existence of a fiduciary relationship, the nature of the fraud alleged, the opportunity to discover the fraud, and the subsequent actions of the defendants. *Id.*

Accordingly, the questions before us are whether, prior to the three year period preceding the initiation of this action, (1) sufficient facts were available to put a reasonable investor in plaintiff's position on inquiry notice of the *possibility* of fraud, and (2) plaintiff exercised due diligence in attempting to uncover the factual basis underlying this alleged fraudulent conduct. *Cook*, 573 F.2d at 697; *Sleeper v. Kidder, Peabody & Co.*, 480 F.Supp. 1264, 1267 (D.Mass.1979), *aff'd mem.*, 627 F.2d 1088 (1st Cir.1980). Although factually based, these issues may be determined as a matter of law where, as here, the underlying facts are admitted or undisputed. *General Builders Supply*, 796 F.2d at 12 (citing *Sleeper*, 480 F.Supp at 1265). The bur-

den of demonstrating compliance with the statute, moreover, rests with the plaintiff. *Id.* (citing *Cook*, 573 F.2d at 695). Against this background, we turn to a discussion of whether the facts admitted by plaintiff would have prompted a reasonable investor to conduct an inquiry into the possibility of fraudulent activity and whether the plaintiff's conduct satisfied the due diligence standard.

■ In the instant case, we are persuaded that the facts admitted by plaintiff indicate that, long before September, 1982, plaintiff was well aware of certain "storm warnings" that would have alerted a reasonable investor to the possibility of fraudulent conduct and caused careful investigation of the circumstances surrounding the 1972 stock repurchase transaction. Plaintiff admits that, even before 1972, he knew of his father's intention to have his uncles' stock returned to the corporation upon their deaths. He also admits that he knew his father planned for control of the company to pass to him, his two brothers, and his cousin at some time in the future. Knowledge of these facts alone should have put plaintiff on notice that his small minority interest in the corporation (approximately six percent in 1972) had the potential for substantial enlargement (up to 25% or even 33%) and that the price offered by the corporation might not reflect the full value of his shares.

Even if this were not enough to cause a reasonable investor to investigate further, there were yet more dark clouds on the horizon. For instance, plaintiff concedes knowledge of his brother's objection to Gerard Freezer's 1968 stock issuance, on the ground that it would violate his father's plans. In addition, plaintiff admits that four of the defendants urged him not to sell his stock for the price offered by the corporation in 1972 and that, prior to selling his shares, he even attended a corporate meeting at which there was considerable discussion concerning the repurchase of his stock for nearly double the amount of the original offer. Finally, plaintiff concedes that in 1981—more than three years before he commenced this action—he

learned that his brothers had commenced a lawsuit challenging, among other things, the propriety of Gerard Freezer's 1968 stock issuance.

This summary of uncontested facts demonstrates that, since 1972, plaintiff had ample information at his disposal to suggest that his stock was worth significantly more than the amount offered by Gerard Freezer and that the offer may have been an attempt to defraud him. Faced with these facts, we believe that a reasonable investor would have proceeded carefully and sought to learn more concerning the nature and content of the plan developed by Candeloro, Sr. and the impact of this plan on the value of shares, such as plaintiff's, that were not subject to automatic repurchase. Plaintiff, however, did nothing to learn of his father's plan for the future of Gerard Freezer, nor did he attempt to discover how this plan might have been memorialized, until 1985. He made no attempt whatsoever to ascertain the true value of his shares either before immediately accepting the corporation's initial repurchase offer or at any time thereafter. Indeed, plaintiff did not even bother to question any of the relevant parties concerning these issues at any time. Even after learning of his brothers' lawsuit in 1981—and despite his admitted knowledge of his father's plan and his brother Candeloro's frequent statements that the stock issuance violated that plan—plaintiff failed to consult an attorney and made no significant effort to apprise himself of the issues involved in that case or to learn how his father's plan was implicated in that litigation until after the suit had been settled.

Plaintiff attempts to justify his complete inaction by stressing the subjective nature of the "reasonable diligence" test and pointing out that defendants, while owing plaintiff a duty of full disclosure, remained silent with regard to the 1964 Stock Repurchase Agreements. Essentially, his contention is that he acted in a reasonably diligent manner in light of his degree of sophistication and the relationships of trust and confidence he shared with defendants. He argues forcefully that his uncles and brothers, as fellow shareholders in a close corporation, owed him a fiduciary duty, *see Donahue v. Rodd Electrotype Co.*, 367 Mass. 578, 593, 328 N.E.2d 505, 515 (1975); that defendant Iovino, a confidential family advisor on matters regarding the corporation and subsequently plaintiff's attorney on other matters, also owed him a duty of full disclosure; and that these relationships of trust and confidence were enhanced by the fact that all of the defendants shared a close family relationship with plaintiff, *see Samia v. Central Oil Co. of Worcester*, 339 Mass. 101, 112, 158 N.E.2d 469, 476 (1959); *but see Kelly v. Kelly*, 358 Mass. 154, 156, 260 N.E.2d 659, 661 (1970) (family relationship alone not enough to establish fiduciary relationship under Massachusetts law).

While we acknowledge that at least some of these arguments may have merit, we do not find it necessary to decide whether a fiduciary relationship existed in this case. Even assuming that defendants owed plaintiff a fiduciary duty, this does not excuse plaintiff's complete failure even to inquire about the facts that he admits were known to him. As we indicated in *Cook*, a plaintiff must " 'apply his common sense to the facts that are given to him' in determining whether further investigation is needed." *Cook*, 573 F.2d at 696 n. 24 (quoting Note, The Due Diligence Requirement for Plaintiffs Under Rule 10b–5, 1975 Duke L.J. 753, 779). In short, we believe that plaintiff's prolonged failure to investigate the possibility of fraudulent conduct in light of the abundant facts known to him as early as 1972 can hardly be characterized as due diligence.

For the reasons elaborated above, we are persuaded that plaintiff, in the exercise of reasonable diligence, would have discovered the facts underlying his present claims long before the commencement of the three year period ending in September, 1985, when he filed his complaint in the instant case. Consequently, we hold that his federal causes of action accrued prior to September, 1982 and that his claims based on violations of the securities laws are therefore barred by the statute of limitations.

## IV. *Accrual of the State Claims.*

With regard to his state claims for fraud and breach of fiduciary duty, plaintiff similarly contends that these claims did not accrue, or that the statute of limitations was tolled, until his discovery of the 1964 Stock Repurchase Agreements in May, 1985. Plaintiff's state law argument has two parts, one of which focuses on the "discovery rule" for inherently unknowable injuries, while the other is premised upon the interaction of the fiduciary duty doctrine and the Massachusetts fraudulent concealment statute, Mass.Gen.L. ch. 260, § 12. We address each of these arguments in turn.

### A. *The Discovery Rule.*

Although in Massachusetts an action in tort generally accrues at the time of the plaintiff's injury, *see Joseph A. Fortin Constr., Inc. v. Massachusetts Housing Finance Agency,* 392 Mass. 440, 442, 466 N.E.2d 514, 516 (1984); *Dinsky v. Town of Framingham,* 386 Mass. 801, 803, 438 N.E.2d 51, 52 (1982), there is a well established exception for actions based on "inherently unknowable" wrongs. Under this exception, such actions accrue when the injured party knew or, in the exercise of reasonable diligence, should have known the factual basis for the cause of action. *See Dinsky,* 386 Mass. at 803, 438 N.E.2d at 52; *Friedman v. Jablonski,* 371 Mass. 482, 485, 358 N.E.2d 994, 997 (1976); *Hendrickson v. Sears,* 365 Mass. 83, 91, 310 N.E.2d 131, 136 (1974); *Frank Cooke, Inc. v. Hurwitz,* 10 Mass.App.Ct. 99, 106, 406 N.E.2d 678, 683 (1980). Plaintiff therefore argues that his state law claims are not time barred because his injury was " 'inherently unknowable even in retrospect.' " *Gore v. Daniel O'Connell's Sons, Inc.,* 17 Mass.App.Ct. 645, 649, 461 N.E.2d 256, 260 (1984) (quoting *Urie v. Thompson,* 337 U.S. 163, 169, 69 S.Ct. 1018, 1024, 93 L.Ed. 1282 (1949)).

We need not linger long on this argument in light of our discussion above. The Massachusetts discovery rule, like the federal tolling doctrine, requires us to apply the "reasonable diligence" standard to the facts admitted by plaintiff. As we have already noted, plaintiff was on inquiry notice of the possibility of fraud and, based on what he knew, failed to act in a reasonably diligent manner to uncover the facts underlying his claims. We therefore hold that the state law exception for "inherently unknowable" wrongs is of no assistance to plaintiff in this instance. Had he exercised a reasonable degree of diligence, he also would have discovered the basis of his state law claims long prior to September, 1982.

### B. *Fraudulent Concealment and Breach of Fiduciary Duty.*

Plaintiff's second argument is that the statute of limitations must be tolled pursuant to the Massachusetts statutory provision pertaining to the fraudulent concealment of claims. Mass.Gen.L. ch. 260, § 12. Section 12 states:

> If a person liable to a personal action fraudulently conceals the cause of such action from the knowledge of the person entitled to bring it, the period prior to the discovery of his cause of action by the person so entitled shall be excluded in determining the time limited for the commencement of the action.

*Id.* Plaintiff urges us to interpret this language in a manner such that section 12 "has the effect of tolling the limitations period in cases of fraudulent concealment until the cause of action is discovered." *Solomon v. Birger,* 19 Mass.App.Ct. 634, 637 n. 6, 477 N.E.2d 137, 140 n. 6 (1985).

Our review of Massachusetts law indicates that section 12 generally requires a plaintiff to show an affirmative act of fraudulent concealment on the part of the defendant. *See Janigan v. Taylor,* 344 F.2d 781, 783–84 (1st Cir.1965), *cert. denied,* 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965); *Federal Insurance Co. v. Summers,* 330 F.Supp. 1041, 1044 (D.Mass. 1970). Where a fiduciary relationship exists between plaintiff and defendant, however, mere failure to reveal information may be sufficient to constitute fraudulent conduct for the purposes of section 12. *Jenkins v. Jenkins,* 15 Mass.App.Ct. 934,

444 N.E.2d 1301, 1303 (1983); *Burns v. Massachusetts Institute of Technology*, 394 F.2d 416, 419 (1st Cir.1968) ("Breach of the resulting duty of disclosure is a substitute for the active fraud normally required to constitute fraudulent concealment within [section 12]."). In this respect, the state doctrine of fraudulent concealment is not entirely different from the federal doctrine which, as described above, applies even if there are "no ... efforts on the part of the party committing the fraud to conceal it from the knowledge of the other party." *Cook*, 573 F.2d at 694 (quoting *Bailey*, 88 U.S. (21 Wall.) at 348).

Assuming without deciding that the defendants owed plaintiff a fiduciary duty under Massachusetts law, *see supra* p. 129, we cannot hold that this factor alone is sufficient to excuse plaintiff's failure to detect at an earlier date the factual basis for the fraud he now alleges. Section 12 tolls the statute of limitations only

> if the wrongdoer, either through actual fraud or in breach of a fiduciary duty of full disclosure, keeps from the person injured knowledge of the facts giving rise to a cause of action *and the means of acquiring knowledge of such facts.*

*Frank Cooke, Inc. v. Hurwitz*, 10 Mass. App.Ct. at 106, 406 N.E.2d at 683 (citations omitted; emphasis supplied). *Accord Tracerlab, Inc. v. Industrial Nucleonics Corp.*, 313 F.2d 97, 101–02 (1st Cir.1963) (despite tolling provision of section 12, limitations period begins to run when party aggrieved by fraudulent concealment has "full means of detecting the fraud"). Thus, plaintiff must be able to show not only that crucial facts were withheld by defendants owing a duty of full disclosure, but also that he lacked the means to uncover these facts. It is on this latter point that plaintiff's state law theory of fraudulent concealment fails.

As we have indicated above, there is nothing to suggest that plaintiff lacked the means of detecting the fraud prior to September, 1982. In April, 1972, he sold his shares to the corporation for $30,000 against the advice of four of the defendants, with full knowledge of his father's intentions for the future control of Gerard Freezer, and without even conducting a cursory investigation as to whether his stock was worth more than the offered price. In 1981, moreover, he learned of his brothers' lawsuit against Gerard Freezer, but chose not to consult an attorney or read the public record until after the case had settled four years later. Significantly, it was upon examining the documents in the record of that case that he first discovered a copy of the 1964 Stock Repurchase Agreements. In our view, the undisputed facts demonstrate that plaintiff had full means of detecting the alleged fraud prior to September, 1982, but failed to undertake even a minimal effort to pursue the investigative opportunities available to him. In such a situation, not even the combination of fiduciary duties and section 12 are sufficient to excuse a delay in bringing suit. Accordingly, we hold that the fraudulent concealment theory embodied in section 12 does not support plaintiff and that his state law claims are barred by the statute of limitations.

*The judgment of the district court is affirmed.*