Kirpalani, Maynard M., J.
INTRODUCTION
This action arises out of loans WMC Mortgage LLC (“WMC”)[2] made to the plaintiff, David Ossers (“Ossers”), in exchange for two separate mortgages on property in Lawrence, Massachusetts, which Ossers purchased in June 2005. This action also involves the subsequent securitization of Ossers’s mortgages and his later default. In June 2009, Ossers filed the Complaint, asserting claims against Litton Loan Servicing LP (“Litton”), Real Time Resolutions, Inc., the Bank of New York Mellon (“BNY”), as trustee for the holders of GE-WMC Asset-Backed Pass-Through Certificates, Series 2005-1, WMC, and Mortgage Options of America (“Mortgage Options”) for civil conspiracy (Count I), violations of G.L.c. 93A (“Chapter 93A”) (Count II), and unconscionability (Count III).[3] This matter is currently before the court on two motions: (1) BNY and Litton’s joint Motion for Summary Judgment (Paper #26); and (2) WMC’s Motion for Summary Judgment (Paper #29). For the reasons explained herein, BNY and Litton’s joint Motion for Summary Judgment will be ALLOWED-, and WMC’s Motion for Summary Judgment will be ALLOWED in part and DENIED in part.
BACKGROUND
The undisputed facts and the disputed facts viewed in the light most favorable to Ossers, as the non-moving parly, are as follows. See Attorney Gen. v. Bailey, 386 Mass. 367, 371 (1982).
I. Pre-Closing
Ossers is a self-employed taxi driver who speaks little English and who does not read or write English. In early 2005, he became interested in purchasing a home.[4] Based on the recommendation of a friend, Ossers contacted a Spanish-speaking mortgage broker from Mortgage Options named Rosalie Rodriguez (“Rodriguez”). Soon after their initial telephone contact, in March or April 2005, Ossers met with Rodriguez to discuss whether Mortgage Options could help him obtain a mortgage loan. Rodriguez was fluent in Spanish and she and Ossers were able to “fully and freely” communicate.
Shortly after their initial meeting, Ossers and Rodriguez met again on April 25, 2005 (the “April Meeting”). During the April Meeting, Rodriguez gave Ossers various documents associated with applying for a mortgage loan, which he signed. Rodriguez had pre-prepared and filled out many of the documents. They were written in English and Ossers relied upon Rodriguez to explain the documents to him. During this process, Ossers told Rodriguez he wanted a loan “that would be comfortable ... [a] [thiriy-]year term, and that wouldn’t cause [him] any trouble” and Rodriguez “agreed to help [him] get such a loan.” Ossers also told Rodriguez he wanted a fixed-rate loan.[5] Rodriguez never told Ossers that the loan he received could be an adjustable rate loan.
At the April Meeting, Ossers signed two Uniform Residential Loan Applications (“URLA”) in connection with two separate loans. The first referenced a $218,400 mortgage loan with a 6.900% interest rate (the “First Loan”). The second referenced a $54,600 mortgage loan with an 11.600% interest rate (the “Second Loan”) (collectively the “Loans”). On page one of the URLAs for both loans, under “Amortization Type,” there is a check mark for “Fixed Rate.” In addition, the URLAs for both loans, on page two, indicate that Ossers’s monthly income was $5,985. Ossers acknowledges that he signed two URLAs during the April Meeting, however, he states that the URLAs he signed did not list an income figure of $5,985 and that the pages showing this figure are forged substitutions prepared in preparation for the closing.[6]
*363 Following the April Meeting, on April 27, 2005, Rodriguez faxed WMC in connection with Ossers’s request for a mortgage loan.[7] Two days later, on April 29, 2005, Rodriguez sent Ossers a Pre-Approval Letter, indicating, under the heading “Loan Terms,” that he was pre-approved for a $250,000 mortgage loan with a one hundred percent loan-to-value ratio for a two-to three-family dwelling that was to be repaid over the course of 360 months.
In addition to assisting with the loan paperwork, Rodriguez also helped Ossers locate a home to purchase by introducing him to a real estate broker named Luis Rodriguez (“Luis”). Like Rodriguez, Luis spoke Spanish and he and Ossers were able to easily communicate. Luis showed Ossers various properties in the Lawrence area, including a single-family home located at 83 Allston Street (the “Property”). Ultimately, Ossers decided to purchase this Property, intending to live there with his wife as well as his son, daughter-in-law, and grandchildren. On June 8, 2005, Ossers signed a purchase and sale agreement to buy the Property for $273,000 from Migdalia Cruz (“Cruz”).
On June 10, 2005, WMC performed an underwriting review in connection with Ossers’s request for a mortgage loan. The Underwriting Review Report, dated June 10, 2005, for Ossers’s First Loan indicates the Property is a two-family dwelling and that the loan has a “Back DTI” of 66.85%.[8] With respect to Approval Condition Number 16, the Underwriting Review Report states, “DTI exceeded maximum limit. DTI must be reduced to meet underwriting guidelines.”[9] The Underwriting Review Report prepared in connection with Ossers’s Second Loan states, “(u)nable to generate grade based on the input. Maximum severity." These Underwriting Review Reports do not appear to reference the income information contained in the URLAs Ossers signed during the April Meeting, which, as explained above, Ossers claims were fraudulently changed; rather, the Underwriting Review Reports appear to have been generated based upon Ossers receiving monthly wages of $4,250 as well as approximately $750 in rental income. [10]
Sometime after the initial underwriting review, new URLAs were prepared indicating Ossers’s monthly income was $5,800.[11] Ossers claims that he was never told that new URLAs were being prepared with different income figures. Nor that these new URLAs were prepared, following the issuance of the Underwriting Review Reports, to bring his income into compliance with WMC’s underwriting requirements. Based on this new income figure, WMC issued a Notice of Conditional Approval and a closing was scheduled in connection with the Loans.
II. The Closing
The closing began at 4:00 p.m., on July 1, 2005, the Friday before the Fourth of July weekend. Ossers, Cruz, Luis, and Israel Collazo (“Collazo”), WMC’s closing attorney, attended. According to Ossers, at the start of the closing, he asked Collazo if he needed an attorney to represent his interests and Collazo answered that he “would not do anything that would be bad for [Ossers]” and that he (Collazo) “would realize if something was wrong.” [12] Everybody at the closing spoke Spanish and the closing was conducted in Spanish, however, all the documents were in English. Ossers states that the closing was rushed. Collazo presented each document to Ossers by pointing to the place where Ossers needed to sign or initial and stating, in Spanish, “sign here” or “initial here.” Collazo did not reference specific sections of the documents; he did not explain or translate any of the documents. Ossers did not ask anyone to translate the loan documents for him or ask any questions about the documents.
During the course of the closing, Ossers executed the following documents; a URLA listing his income as $5,800 per month; the First Loan, which consisted of a thirty-year adjustable rate note in the principal amount of $218,400; a mortgage on the Property in the principal amount of $218,400, which included an Adjustable Rate Rider as well as a Balloon Rider; the Second Loan, which consisted of a fifteen-year note in the principal amount of $54,600 with a fixed interest rate; a second mortgage on the Property in the principal amount of $54,600; a Variable Rate Mortgage Program Disclosure form, which stated, in part, that Ossers’s “monthly payment c[ould] change after the first twenty-four months, and then once every six months thereafter, based upon changes in the interest rate”; and Truth-in-Lending Disclosure forms, disclosing the annual percentage for the interest rate and a schedule of monthly payments.
The combined value of the Loans is $273,000. The First Loan covered eighty percent of the Property’s purchase price and the Second Loan covered the remaining twenty percent. Thus, the First and Second Loans have a combined loan-to-value ratio of one hundred percent. The First Loan is amortized over forty years and possesses a thirty-year payment term. The First Loan possesses a twenty-four-month introductory interest rate of 5.75%. Then, at the end of this period, and at every six-month period thereafter, the interest rate for the First Loan is set to adjust by adding 5.375% to an index rate rounded to the nearest 0.125%. The index rate used is the six-month London Interbank Offered Rate (“LIBOR”) as published in the Wall Street Journal The six-month LIBOR rate in July 2005 was 3.9235%. Thus, in July 2005, the fully indexed rate for the First Loan was 9.250%, calculated by adding the LIBOR rate of 3.9235% to the introductory rate of 5.75% and rounding to the nearest 0.125%. The First Loan also required a balloon payment in month 360 of $132,637.43. The Second Loan possessed a fifteen-year payment term and contained a fixed interest rate of 11.5%. It also required a balloon payment in month 180 of $46,825.54.
*364 III. WMC Transfers Ossers’s Loans
WMC always intended to transfer the Loans. And, approximately three months after the Loans were originated, on September 28, 2005, WMC followed through with this plan, selling the Loans to GE Mortgage Holding, LLC (“GE Mortgage”). On this same date, the Loans, along with many others, were sold to GE-WMC Mortgage Securities, LLC (“GE-WMC”). The Loans were then securitized into a trust called the GE-WMC Asset-Backed Pass-Through Certificates Series 2005-1 (the “Trust”). The Trust was created pursuant to a Pooling and Servicing Agreement (the “Pooling Agreement”), dated September 1, 2005, among GE-WMC, as depositor, Litton, as servicer, and BNY, as trustee. And, in accordance with the Pooling Agreement, in September 2005, Litton began servicing both the Loans.
IV. Ossers’s Defaults
On June 7, 2007, Litton notified Ossers that his monthly payment on the First Loan would be increasing from $1,163.83 to $1,630.15 due to the loan’s adjustable rate feature. When Ossers received this letter, he “made [his] son read it and translate it for [him].”[13] Ossers was “surprised” by the rate increase because he did not think he had an adjustable rate loan and he “immediately” had difficulty making his mortgage payments. By letter dated July 17, 2007, Litton notified Ossers that he had defaulted on the First Loan. On February 12, 2008, MERS assigned the First Loan to BNY. Then, on July 10, 2008, servicing of the Second Loan was transferred from Litton to Real Time Resolutions, Inc. On June 29, 2009, Ossers brought the current action, asserting claims for civil conspiracy, violations of Chapter 93A, and unconscionability.
DISCUSSION
BNY and Litton argue they are entitled to summary judgment on each of Ossers’s claims. First, they contend that the claim for civil conspiracy is barred by the statute of limitations and, even if it were not time-barred, there is no evidence they participated in a conspiracy to engage in wrongful conduct. Second, BNY and Litton claim that, as a matter of law, they cannot be held liable for the misconduct asserted under the Chapter 93A claim. Third, they argue the claim for unconscionability fails because there is no privity between them and Ossers and because Ossers has not presented sufficient evidence to establish that his mortgage loans were either procedurally or substantively unconscionable. In its Motion for Summary Judgment, WMC makes similar arguments with the added assertion that, with respect to the Chapter 93A claim, Ossers has failed to present evidence demonstrating that his mortgage loans satisfy the criteria for what constitutes a presumptively unfair loan. The court addresses these arguments below.
I. Standard of Review
Summary judgment will be allowed where, viewing the evidence in the light most favorable to the non-moving party, all material facts have been established and the moving party is entitled to judgment as a matter of law. Cabot Corp. v. AVX Corp., 448 Mass. 629, 636-37 (2007); Mass.R.Civ.P. 56(c). “The moving party must establish that there are no genuine issues of material fact, and that the non-moving party has no reasonable expectation of proving an essential element of its case.” Miller v. Mooney, 431 Mass. 57, 60 (2000); see also Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). When the moving party does not bear the burden of proof at trial, it is entitled to summary judgment either by submitting affirmative evidence that negates an essential element of the opposing party’s case, or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of its case at trial. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
While the record must be examined in the light most favorable to the non-moving party, Foster v. Group Health, Inc., 444 Mass. 668, 672 (2005), “[cjonclusory statements, general denials, and factual allegations not based on personal knowledge [are] insufficient to avoid summary judgment.” Cullen Enters., Inc. v. Massachusetts Prop. Ins. Underwriting Ass’n, 399 Mass. 886, 890 (1987). The court does not weigh evidence, assess credibility or find facts, Attorney Gen., 386 Mass. at 370-71, however, “[i]f the opposing party falls to properly present specific facts establishing a genuine, triable issue, summary judgment should be granted.” Cullen Enters., Inc., 399 Mass. at 890.
II. Civil Conspiracy (Count I)
Ossers claims that BNY, Litton, and WMC engaged in a conspiracy “to buy, sell and service high-cost home mortgage loans with reckless disregard of the borrowers’ risk of foreclosure.” BNY and Litton as well as WMC contend this claim is barred by the statute of limitations. A claim for civil conspiracy is an action in tort and must “be commenced . . . within three years next after the cause of action accrues.” G.L.c. 260, §2A; see also Pagliuca v. Boston, 35 Mass.App.Ct. 820, 823 (1994). When a cause of action accrues has not been defined by statute, but has been the subject of judicial interpretation. See Riley v. Presnell 409 Mass. 239, 243 (1991). Generally, claims based in tort begin to accrue when the injury occurs. See Doe v. Harbor Schs., Inc., 446 Mass. 245, 254 (2006).
Here, BNY, Litton, and WMC contend the civil conspiracy claim began to accrue at the closing, on July 1, 2005, because this is when they “allegedly conspired to provide [Ossers] a high-cost loan in disregard of his income" and also when WMC “allegedly failed to disclose that [Ossers’s] loans contained certain ‘predatory’ terms.” Ossers, however, disagrees, contending this claim did not begin to accrue until June 7, 2007, which is the date Litton notified him that his *365 monthly payment was increasing from $1,163.83 to $1,630.15, because this is when he first discovered that he had been injured. This dispute is no little matter. Ossers filed the Complaint, including the claim for civil conspiracy, on June 29, 2009. If the court accepts July 1, 2005 as the accrual date, the civil conspiracy claim would have had to have been filed no later than July 1, 2008 and thus, it is untimely. If the court accepts June 7, 2007 as the accrual date, Ossers had until June 7,2010 to file the civil conspiracy claim and therefore, it is not time-barred.
Claims arising out of mortgage transactions typically begin to accrue on the date of the closing. See Salois v. Dime Sav. Bank of N.Y., FSB, 128 F.3d 20, 25-26 (1st Cir. 1997). As Ossers points out, however, under the discoveiy rule, the statute of limitations may be tolled “until the plaintiff learns, or reasonably should have learned, that he has been harmed by the defendant’s conduct.” White v. Peabody Constr. Co., Inc., 386 Mass. 121, 129 (1982). Thus, the court must determine when Ossers reasonably should have learned that he had been injured.
The discovery rule tolls the statute of limitations until an injuiy is no longer “inherently unknowable” and a reasonably prudent person in the plaintiffs position, reacting to any suspicious circumstances of which he might be aware, should have discovered the harm and its cause. Bowen v. Ely Lilly & Co., Inc., 408 Mass. 204, 206-08 (1990). The claimant relying on the discovery rule bears the burden of “proving both an actual lack of.. . knowledge and the objective reasonableness of that lack of knowledge.” Koe v. Mercer, 450 Mass. 97, 101 (2007). The discoveiy rule is not without limits. It “is not an endless protected time zone against the deadlines of a statute of limitations.” Frankston v. Denniston, 74 Mass.App.Ct. 366, 373 (2009). It is not applicable where the plaintiff has, in his possession, all the information necessary to put him on notice of his claim. See Maggio v. Gerard Freeze & Ice Co., 824 F.2d 123, 129 (1st Cir. 1987) (discussing Massachusetts law).
In this case, at the closing, Ossers was given all the information necessary to determine he had been injured. He was given all the loan documents, including the URLAs, which he now states included forged income information, as well as notice that the First Loan was an adjustable rate mortgage. No information was actively concealed from Ossers. He left the closing with copies of all the loan documents. And, he cannot now successfully argue he should be allowed to invoke the discovery rule merely because he spoke Spanish and the loan documents were in English.[14] Everybody attending the closing spoke Spanish and the closing was conducted in Spanish. Ossers chose to sign the loan documents without asking any questions or requesting a translation. In this respect, Ossers is no different from the English-speaking borrower who signs loan documents without reading them and then claims to not have known about certain terms.
Any assertions that the terms of the Loans did not comport with either what he had requested, or what he had been told would be included, were objectively apparent on the face of the documents. Having failed to act diligently, Ossers may not invoke the discoveiy rule to toll the statute of limitations. See Oakwood Mobile Homes, Inc. v. Barger, 773 So.2d 454, 461 (Ala. 2000) (“If the purchaser blindly trusts where he should not, and closes his eyes where ordinary diligence requires him to see, he is willingly deceived”). The court concludes that BNY, Litton, and WMC are correct and that the claim for civil conspiracy began to accrue at the closing, on July 1, 2005, and thus, it should have been filed on or before July 1, 2008. Since Ossers did not file it until June 29, 2009, the claim for civil conspiracy is barred by the statue of limitations.
For these reasons, BNY and Litton’s joint Motion for Summary Judgment as well as WMC’s Motion for Summary Judgment will be ALLOWED as to Count I (civil conspiracy).
III. Chapter 93A (Count II)
To prevail on a Chapter 93A claim, a plaintiff must show that a defendant engaged in “(u)nfair methods of competition and unfair or deceptive acts or practices in business transactions.” G.L.c. 93A, §2. Conduct is unfair if it lies “within at least the penumbra of some common-law, statutoiy, or other established concept of unfairness; . . . whether it is immoral, unethical, oppressive, or unscrupulous; [and] whether it causes substantial injury to consumers...” PMP Assocs., Inc. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975). Practices are deceptive if they could reasonably be found to have “caused a person to act differently from the way he [or she] otherwise would have acted.” Aspinall v. Philip Morris Cos., Inc., 442 Mass. 381, 394 (2004), quoting Purity Supreme, Inc. v. Attorney Gen., 380 Mass. 762, 777 (1980).
Ossers’s Chapter 93A claim is premised upon two assertions. First, he contends that the Loans are presumptively unfair under the principles articulated in Commonwealth v. Fremont Inv. & Loan, 452 Mass. 733 (2008) (hereinafter “Freemont). Second, he alleges BNY, Litton, and WMC violated various state regulations pertaining to the issuance of mortgage loans and intentionally and/or negligently caused him emotional distress and that this conduct supports a claim for violation of Chapter 93A. Below, the court addresses both of these contentions; however, as an initial matter the court notes that neither BNY nor Litton can be liable under Chapter 93A based upon either of Ossers’s arguments because they were not involved in issuing the Loans.[15] See Darden v. Noyes, 2010 WL 4456992 at *7 (Mass.Super.Ct. Aug. 5, 2011) [27 Mass. L. Rptr. 448] (Hines, J.) (holding “an assignee may not be held affirmatively liable for the wrongful conduct of the assignor”); In re Mae, 2011 WL2413319 *366 at *2 (Bankr.D.Mass. June, 10, 2011) (Bailey, J.) (“Liability under [Chapter 93A] . . . may not be predicated solely on the fact that the defendant is the assignee of another whose conduct violated that statute”); Oduro v. Accredited Home Lenders, Inc., 2010 WL 1816239 (Mass.Super.Ct. Mar. 16, 2010) [27 Mass. L. Rptr. 83] (Tucker, J.) (concluding Bank of America, assignee of Accredited Home Lenders, the loan originator, could not be liable under Chapter 93A for the originator’s misconduct). For these reasons, BNY and Litton’s joint Motion for Summary Judgment will be ALLOWED as to Count II (Chapter 93A). Thus, the court analyzes Ossers’s Chapter 93A claim only as it pertains to WMC.
A. Presumptively Unfair
Chapter 93A prohibits “the origination of a home mortgage loan that the lender should recognize at the outset the borrower is not likely to be able to repay.” Fremont, 452 Mass. at 749. Such loans are characterized by a combination of the following four criteria: (1) the loans are adjustable rate mortgage loans with an introductory rate period of three years or less; (2) they feature an introductory rate for the initial period that is at least two percent below the fully indexed rate; (3) they are made to borrowers whose DTI ratio would have exceeded fifty percent had the lender measured the borrower’s monthly debt based upon the payments that would be due at the fully indexed rate rather than under the introductory rate; and (4) the loans have a loan-to-value ratio that is at least 97%. Commonwealth v. Option One Mtge. Co., 2008 WL 5970550 (Mass.Super. Nov. 10, 2008) (Gants, J.) (modifying the standard articulated in Fremont, 452 Mass. at 739). Loans containing these four characteristics are deemed predatory and they are presumptively unfair under Chapter 93A. See Fremont, 452 Mass. at 749-52.
Here, the Loans clearly meet the first, second, and fourth requirements for a presumptively unfair loan. The First Loan had an adjustable rate with an introductory period of three years or less. More specifically, the closing on the First Loan took place on July 1,2005 and the interest rate adjusted just two years later on July 1, 2007. Further, the introductory rate of 5.75% is over two percentage points lower than the fully indexed rate of 9.250%.[16] Finally, the First Loan was for $218,400.00 and the Second Loan was $54,600.00, for a combined total value of $273,000.00, which was the exact purchase price for the Property. Thus, the loan-to-value ratio for the Loans was one hundred percent.
The third criteria, which requires the borrower to demonstrate his/her DTI ratio exceeded fifty percent, when measured under the fully indexed rate, presents more of a challenge. Essentially, there are three different income figures at play in this case and Ossers’s DTI ratio under the fully indexed interest rate changes depending upon which figure is used. Ossers signed URLAs and the original Underwriting Review Reports were generated using an income figure of $4,250.00, which results in a DTI of 57.9%. Now, Ossers claims his monthly income was only $2,462.66, which yields a DTI of 95.9%. Then, at the closing, Ossers signed loan documents listing his monthly income as $5,800.00, which results in a DTI of 42.5%.
In the usual course, the court might be persuaded to disregard the first two income figures and merely accept the figure identified in the closing documents. However, in this case, Ossers claims that, in preparing for the closing, WMC, without his permission, substituted the income pages on his loan applications for pages containing a higher figure, while knowing his actual income was much lower, to bring him into compliance with underwriting criteria. WMC denies such conduct. Thus, the court is presented with a disputed issue of material fact, preventing entry of summary judgment. If WMC did indeed change Ossers’s income figure to reflect a higher monthly income, all the while knowing his actual income, the Loans meet the third Freemont factor and WMC can be said to have issued a “presumptively” unfair loan. On this basis, WMC could be liable under Chapter 93A.
B. State Regulations and Common-Law Negligence
Next, Ossers alleges WMC violated Chapter 93Aby: (1) failing to disclose to Ossers facts related to the transaction, which may have influenced him not to enter into the transaction, in violation of 940 Code Mass. Regs. §8.05(2); (2) failing to take reasonable steps to communicate the material facts of the transaction to Ossers, in a language he could understand, in violation of940 Code Mass. Regs. §8.05(3); (3) failing to consider Ossers’s ability to repay his mortgage loans, in violation of 940 Code Mass. Regs. §8.06(15); and (4) intentionally and/or negligently inflicting emotional distress upon Ossers. While Ossers does not present a viable claim for intentional or negligent infliction of emotional distress, there are disputed issues of material fact as to whether WMC violated the identified regulatory provisions.[17]
Under 940 Code Mass. Regs. §8.05(2), it is “unfair or deceptive” for “a mortgage . . . lender to conceal or to fail to disclose to a borrower any fact relating to the loan transaction . . . which may have influenced the borrower not to enter into the transaction!.]” And, in accordance with 940 Code Mass. Regs. §8.05(3), it is “unfair or deceptive” for “the mortgage . . . lender to fail to take reasonable steps to communicate the material facts of the [loan] transaction! ] in a language that is understood by the borrower.” These “reasonable steps” include, but are not limited to “using adult interpreters,” 940 Code Mass. Regs. §8.05(3)(a), or “providing the borrower with a translated copy of the . . . forms required by any applicable state or federal law, regulation, or directive, in a language understood by the borrower,” 940 Code Mass. Regs. §8.05(3)(b).
*367 Ossers contends that: (1) he requested a thirty-year fixed-rate mortgage loan; (2) he was led to believe this was the type of loan he was receiving; (3) WMC concealed the fact that the First Loan had an adjustable rate by rushing through the closing and providing all the loan documents in English, a language he could not read or understand; and (4) he would not have entered into the mortgage transaction had he known that the First Loan was an adjustable rate loan. In accordance with the above regulations, WMC had an obligation to disclose the material terms of the loan transaction in a language Ossers understood. Ossers spoke Spanish; he did not read or understand English. And, while Collazo, WMC’s closing attorney, spoke Spanish and, by all accounts, conducted the verbal portions of the closing in Spanish, all the documents were in English and neither Collazo nor any of the other individuals present actually translated any of the documents for Ossers. Whether WMC can be said to have taken “reasonable steps” to communicate the material facts of the transaction to Ossers under such circumstances remains an issue of fact.
Pursuant to 940 Code Mass. Regs. §8.06(15), “(i]t is an unfair or deceptive act or practice for a mortgage . . . lender to make a mortgage loan unless the mortgage . . . lender, based on information known at the time the loan is made, reasonably believes ... that the borrower will be able to repay the loan[.]” In considering whether the borrower could make repayment, the lender is required to evaluate “the borrower’s income, assets, obligations, employment status, credit history, and financial resources[.]” 940 Code Mass. Regs. §8.06(15). Here, Ossers claims that in preparing for the closing, WMC substituted the income pages on his loan applications for pages containing a higher figure, while knowing his actual income was much lower, to ensure he complied with underwriting criteria. WMC denies this conduct. This presents the court with an issue of fact. If WMC did engage in this type of substitution, a fact-finder could conclude that it had issued a mortgage loan without properly considering whether Ossers could make repayment.
Because there are issues of fact as to whether WMC issued a presumptively unfair loan under the criteria set forth in Freemont Inv. & Loan as well as to whether WMC violated the Attorney General’s regulations pertaining to mortgage lenders, WMC’s Motion for Summary Judgment will be DENIED as to Count II (Chapter 93A).
IV. Unconscionability (Count III)
In support of his claim for unconscionability, Ossers contends “there was an inequality of bargaining power between [him] and the Defendants” since he was “unsophisticated” in mortgage-related matters, while they were “major players” in the subprime mortgage lending industry. Ossers also states that he was “surprised” by the terms of the Loans as he was never told about certain predatory terms, such as the adjustable interest rate. At the start, BNY and Litton argue that they are entitled to summary judgment on this claim because they were not involved in issuing the Loans and thus, there is no contract or contractual privily between either of them and Ossers. The court agrees. The doctrine of unconscionability is an equitable doctrine designed to provide a remedy for a contract that is unfair or overly oppressive. See Zapatha v. Dairy Mart, Inc., 381 Mass. 284, 293 (1980). Thus, at base, a plaintiff asserting such a claim must demonstrate the existence of a contract. Here, there was no contract between Ossers and either BNY or Litton. For this reason, BNY and Litton’s joint Motion for Summary Judgment will be ALLOWED as to Count III (unconscionability). As a result, the court analyzes Ossers’ unconscionability claim only as it pertains to WMC.
“Historically, a bargain was considered unconscionable if it was ‘such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other.’ ” Covich v. Chambers, 8 Mass.App.Ct. 740, 750 n.13 (1979), quoting Hume v. United States, 132 U.S. 406, 411 (1989). Now, it is generally understood that unconscionability is a matter of law decided by the court that must be determined on a case-by-case basis. Zapatha, 381 Mass. at 291. In conducting this analysis, particular attention is addressed to “whether the challenged provision could result in oppression and unfair surprise to the disadvantaged party.” Waters v. Min Ltd., 412 Mass. 64, 68 (1992), quoting Zapatha, 381 Mass. at 292-93. “Oppression” is a matter of the substantive unfairness of the contract; “unfair surprise” means procedural unfairness in the manner in which the contract was concluded." Zapatha, 381 Mass. at 293-95. Substantive unconscionability occurs when contract terms are unreasonably favorable to one party. See Gilman v. Chase-Manhattan Bank, N.A., 534 N.E.2d 824, 829 (N.Y. 1988) (stating the question of substantive unconscionability “entails an analysis of the substance of the bargain to determine whether the terms were unreasonably favorable to the party against whom the unconscionability is urged ...”). Meanwhile, procedural unconscionablility “requires an examination of the contract formation process and the alleged lack of meaningful choice.” Id. at 828.
Even if the manner in which the Loans were executed can be said to have been procedurally unconscionable since Ossers spoke only Spanish and WMC failed to either provide the pertinent loan documents in Spanish or offer a translation, Ossers has not demonstrated that the Loans were substantively unsconscionable. The fact that the First Loan had an adjustable interest rate and that both Loans required a balloon payments, which terms are not uncommon, is not sufficient to show that the Loans were unreasonably favorable to WMC. Especially in light of the fact that Ossers clearly received a benefit from the Loans as the $273,000.00 he received allowed him to purchase his home. See In re DiMare, 462 B.R. 283, 299 (Bankr.D.Mass. 2011). The court concludes that *368 the allocation of risk with respect to the Loans was not such that it disproportionately benefited WMC.[18] Because Ossers has not presented sufficient evidence to demonstrate the Loan was substantively unconscionable, WMC’s Motion for Summary Judgment will be ALLOWED as to Count III (unconscionability).
ORDER
For the reasons stated above, it is hereby ORDERED that:
1. BNY and Litton’s joint Motion for Summary Judgment (Paper #26) be ALLOWED;
2. WMC’s Motion for Summary Judgment (Paper # 29) be ALLOWED as to Count I (civil conspiracy) and Count III (unconscionability).
3. WMC’s Motion for Summary Judgment (Paper #29) be DENIED as to Count II (Chapter 93A).

 According to WMC, Ossers incorrectly named it as WMC Mortgage Corporation in the Complaint.

 On August 31, 2009, Ossers dismissed claims against Real Time Resolutions, Inc. and, on September 29, 2010, Ossers dismissed claims against Mortgage Options of America.

 Prior to this time, Ossers had never purchased any real estate.

 BNY and Litton as well as WMC claim that Ossers never explicitly told Rodriguez he wanted a “fixed rate” loan. According to Ossers’s deposition testimony, taken on August 12, 2010, he told Rodriguez he wanted a “thirty[-year]” loan “with the same interest rate.”

 In support of this assertion, Ossers points out that neither his initials nor his signature appear on these income pages, though one or the other is written on all the other pages of the URLAs. He also points out that, according to the fax transmittal line at the top of these pages, Mortgage Options faxed these two pages to the closing attorney on June 30, 2005, while pages one, three and four of the URLAs were faxed to the closing attorney on July 1, 2005.

 Almost a year before Ossers became involved with Rodriguez and Mortgage Options, on August 23, 2004, Mortgage Options and WMC entered into a broker origination agreement whereby Mortgage Options agreed to submit mortgage loan applications to WMC for review and approval.

 “DTI” refers to debt-to-income ratio.

 According to WMC’s underwriting guidelines, for a “stated” income loan, such as the Loans, a borrower’s DTI could not exceed 50%.

 There are two undated and unsigned URLAs contained in the summaiyjudgment record. One references a $221,600, ”[c]onvenhonal,” ”[f]lxed [r]ate” loan with a 7.250% interest rate to be repaid over 360 months. The other references a $55,400 “[cjonventional,” ”[f]ixed [r]ate” loan with a 11.500% interest rate to be repaid over 180 months. On page two of both of these URLAs, Ossers’s income is listed as $4,250.

 Ossers asserts that WMC prepared the new URLAs, but WMC challenges the term “prepared.”

 This exchange notwithstanding, at his deposition, Ossers testified that, going into the closing, he understood that Collazo would be representing WMC.

 His son is bilingual.

 Although it does not represent binding precedent, Diaz v. Bank of America Home Loan Servicing, 2010 WL 5313417 (C.D.Cal. Dec. 16, 2010) (Gutierrez, J.), represents a factually similar case and thus, is instructive. In that case the borrower asserted a variety of common-law and statutory claims, alleging that Bank of America’s Spanish-speaking agents had falsified his financial documents to qualify him for a loan and then, coerced him into accepting the loan by speaking to him in Spanish while providing all of the loan documents in English. Id. at * 1. The court rejected the borrower’s argument that the statute of limitations on his TILA claim should be equitably tolled, finding that, even if a language barrier could support equitable tolling, the borrower had failed to demonstrate he had acted diligently in discovering his claim. Id. at *3. Specifically, according to the court, ”[n]o fact pleaded by [the borrowerl indicates his own due diligence . . . Although they were not in Spanish, potential violations were objectively and reasonably apparent on the face of the documents [the borrower] received when his loan closed.” Id. Ultimately, the court concluded that, “even if loan documents were not provided in [the borrower’s] native language, a reasonable [borrower]... [in his position] would [have] s [ought] a translation.” Id.

 The closing on Ossers’s loans took place on July 1,2005. It was almost three months later, on September 28,2005, that the loans were transferred to GE Mortgage and sold to GE-WMC and securitized in the Trust, which was created pursuant to the Pooling Agreement signed, on September 1, 2005, among GE-WMC, as depositor, Litton, as servicer, and BNY, as trustee. Clearly, neither BNY nor Litton were involved in the origination of Ossers’s loans and thus, they cannot be liable for wrongdoing allegedly committed by WMC during the origination process.

 The LIBOR rate on July 1, 2005 was 3.9235%. Adding this to the introductory rate of 5.75% and rounding to the nearest 0.125% equals the First Loan’s fully indexed rate of 9.250%.

 Ossers cannot establish a claim under Chapter 93A based on intentional infliction of emotional distress because WMC’s exercise of its right to foreclose, after his default, cannot constitute extreme and outrageous conduct. See e.g., Alpino v. JP Morgan Chase Bank, N.A., 2011 WL 1564114 at *8 (D.Mass. Apr. 21, 2011) (Saris, J.) (dismissing borrower’s claim because “[t]hough defendants may have engaged in some legally cognizable wrongdoing, and though the [plaintiff] may have suffered greatly, there is no indication that the defendants’ actions were extreme and outrageous”); In re Fernandes, 2011 WL 322017 at *3 (Bankr.D.Mass. Jan. 31, 2011) (Bailey, J.) (dismissing claim based on bank’s actions to foreclose, finding bank’s exercise of “what it believed was its right to foreclose in the face of protestations to the contrary by the mortgagor,” even if it was not actually entitled to foreclose, “cannot constitute the ‘extreme and outrageous conduct’ that is required element of [intentional infliction of emotional distress]”). Neither can Ossers establish a claim under Chapter 93A premised upon negligent infliction of emotional distress because such a claim requires a showing that WMC owed Ossers some duly and “a lender owes no duty of care to a borrower!.]” Fernandes v. Havkin, 731 F.Sup.2d 103, 121 (D.Mass. 2010); see also Corcoran v. Saxon Mtge. Servs., Inc., 2010 WL 2106179 *4 (D.Mass. May 24, 2010) (Gorton, J.) (dismissing negligence claim against lender because “a lender owes no general duty of care to a borrower”).

 Here, the court notes that the fact that WMC’s conduct in executing the Loan may constitute an unfair or deceptive practice in violation of Chapter 93A “does not [automatically] mean [WMC’s] . . . conduct was unconscionable.” In re Laudani, 401 B.R. 9, 34 (Bankr.D.Mass. 2009).