NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-11743

MOLLY A. HAYS  vs.  DAVID J. ELLRICH & others.[1]


Suffolk.     February 3, 2015. - June 10, 2015.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, & Hines, JJ.


Uniform Securities Act.  Securities, Sale.  Fraud.  Fiduciary. Limitations, Statute of.  Evidence, Fraud.  Practice, Civil, Fraud, Statute of limitations.



Civil action commenced in the Superior Court Department on September 11, 2006.

The case was heard by Christine M. Roach, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.


David B. Mack (Stephanie R. Parker with him) for the defendants.
Patrick J. Dolan for the plaintiff.


GANTS, C.J.  In January, 2001, in reliance on the advice of her investment advisor, the plaintiff, Molly A. Hays, invested

---

[1] Morgan Financial Advisors, Inc. (MFA), and U.S. Bank National Association (U.S. Bank).  U.S. Bank is not a party to this appeal.

approximately three-quarters of her retirement savings in a hedge fund that became insolvent in 2003, resulting in the loss of her entire investment. In 2006, Hays filed suit in the Superior Court, alleging that her investment advisor, Morgan Financial Advisors, Inc. (MFA), and David J. Ellrich, the sole owner and officer of MFA, had, among other claims, violated the Massachusetts Uniform Securities Act (act), G. L. c. 110A, § 410 (a) (2), committed fraud, and committed a breach of their fiduciary duty to her. After a jury-waived trial, the judge ruled that Ellrich and MFA were liable under § 410 (a) (2), and entered judgment in Hays's favor for $381,354.80 plus interest.[2,3] MFA and Ellrich appealed, and we transferred the case to this court on our own motion.

On appeal, Ellrich and MFA claim that they were not "sellers" of securities within the meaning of § 410 (a) (2), and therefore cannot be liable under the act. They also argue that

---

[2] The trial on liability proceeded against MFA only, because David J. Ellrich had previously been defaulted for failing to appear at a hearing on his attorney's motion to withdraw as counsel of record, despite having been ordered by the court to appear at the hearing, and despite having been notified by his counsel of the date of the hearing.

[3] The trial judge also found in Molly A. Hays's favor on her common-law claims of fraud and breach of fiduciary duty, and entered judgment "consistent with, but not duplicative of," the statutory count under G. L. c. 110A, § 410. The judge found in favor of the defendants on breach of contract claims and an estoppel claim.

the claims on which Hays prevailed are barred by the statute of limitations. In addition, they contend that the judgment must be vacated because it is contrary to the great weight of the evidence.[4] We affirm the judgment.

Background. We summarize the findings of fact made by the judge, supplemented where necessary by uncontested evidence in the record that the judge implicitly credited. See Commonwealth v. Isaiah I., 448 Mass. 334, 337 (2007), S.C., 450 Mass. 818 (2008). We reserve certain facts that directly relate to the legal issues we address.

In approximately 1991, when Ellrich was employed by another investment advisory firm, Hays and her husband retained Ellrich as an investment advisor to manage some of their funds. Before her husband's death in 1993, Ellrich communicated almost exclusively with Hays's husband, and rarely with her. Shortly after her husband's death, Hays met with Ellrich to discuss the management of the individual retirement account (IRA) she had inherited, which totaled approximately $310,000 at the time. Hays told Ellrich that she needed income but wanted to remain at home with her five year old daughter.[5] Ellrich told Hays, who

---

[4] Ellrich also claims that it was an abuse of discretion for the trial judge to deny his motion to set aside the default.

[5] Hays had worked for Pan American Airlines as a flight attendant until approximately 1991. She has a bachelor's degree

was forty-one years old in 1993, that she could elect to make periodic withdrawals from the IRA without a tax penalty at the maximum rate permitted under § 72(t) of the Internal Revenue Code -- seven per cent per year at the time.[6]  As a consequence, Hays's investment portfolio needed to achieve an average annual rate of return of more than 11.75 per cent:  seven per cent to cover the withdrawal rate, plus inflation, which averaged approximately three per cent, plus Ellrich's management fee of 1.75 per cent.  From 1993 to 1999, Hays directed Ellrich to employ a "moderate growth and income" investment strategy, which he implemented, maintaining an equities-to-fixed-income ratio of approximately seventy-five per cent to twenty-five per cent. Ellrich pursued a "market-timing" strategy for the equities portion of Hays's investment account, which, by 2000, was invested in funds at Rydex Series Trust (Rydex) and at Profunds Investments (Profunds).  He pursued a "buy and hold" strategy for the fixed income portion, which was invested in long-term investment vehicles maintained by Fidelity Investments (Fidelity).[7]  Hays had no investment experience and had relied

---

in English Literature from the University of South Florida and a master's degree in Library Sciences.

[6] The wisdom or accuracy of this advice is not at issue in the case.

[7] With a "market-timing" strategy (in contrast to a "buy and hold" strategy), an investor actively trades investments to time

upon Ellrich as her financial advisor since her husband's death; during that time period, she made no investment without Ellrich's advice.

In 2000, after Ellrich had registered MFA as an investment advisor, Hays transferred her accounts to MFA, and executed first a portfolio management and services agreement and later a superseding investment advisory agreement with MFA.  MFA was designated as the registered investment advisor on all of Hays's accounts, which totaled approximately $470,000 at the end of 2000.

Also in 2000, Ellrich was approached by Richard Furber about becoming the investment advisor to Convergent Market Funds (Convergent), a new "hedge fund" Furber was creating.[8]  Ellrich agreed in September, 2000, to become the investment advisor to one or more Convergent funds, and MFA executed an investment advisor agreement with Convergent's general partner, Emerging Health Capital Partners LLC (EHCP).  Ellrich determined that, as

the rise and fall of the markets.  According to financial statements Ellrich prepared for Hays, Hays's accounts at Rydex Series Trust, Profunds Investments, and Fidelity Investments together made up more than ninety-nine per cent of Hays's net worth.

[8] A "hedge fund" is a "specialized investment group -- [usually] organized as a limited partnership or offshore investment company -- that offers the possibility of high returns through risky techniques such as selling short or buying derivatives."  Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 46 n.5 (2004), quoting Black's Law Dictionary 727 (7th ed. 1999).

Convergent's investment advisor, he would no longer "have the time or resources" to perform market-timing services for individual accounts, and needed to terminate MFA's advisory business for all of his individual market-timing accounts. In December, 2000, he spoke with each of his approximately 150 individual clients, including Hays, to tell them that those services would be terminating as of December 31, 2000.

During Ellrich's conversation with Hays, he explained to her that he was going to be the investment advisor to a new private fund, and encouraged Hays to transfer her funds to Convergent, telling her that he would personally be making the trades for Convergent and would employ the same strategies and techniques that Ellrich had always employed for her accounts. Ellrich did not explain to Hays what a hedge fund is or the distinctive risks of investing in a hedge fund. He did not speak with her about whether, in light of those risks, such an investment would be suitable for someone relying on her investments to produce a fixed income. He did not tell her that he had no experience trading for a private equity fund, or that Convergent had no track record. And he never provided Hays with a "full and practical explanation of . . . how the historical role he had played as Hays'[s] investment advisor would change," never telling her that he would no longer be considering her individual needs in making trades for Convergent. The judge

found that, "by a combination of his words, his manner, and his tone, Ellrich strongly implied to Hays . . . that Convergent would be a suitable investment for her."[9]

Hays told him that she wanted to invest in Convergent, relying entirely on Ellrich's encouragement. Nearly seventy-five per cent of Ellrich's individual market-timing clients also decided to invest in Convergent, contributing all but $30,000 of the $16.5 million that Convergent initially raised.

In December, 2000, EHCP sent a package of materials to Hays, including an offering memorandum for Convergent securities. The first pages of the offering memorandum warned, "AN INVESTMENT IN THIS PARTNERSHIP INVOLVES A SIGNIFICANT RISK OF LOSS," and, "AN INVESTOR MUST BE IN A POSITION TO BEAR THE ECONOMIC RISK OF AN INVESTMENT IN THE PARTNERSHIP FOR A SIGNIFICANT PERIOD." The offering memorandum identified EHCP as the general partner of Convergent and MFA as Convergent's investment manager, and disclosed the management fee MFA would be receiving from the general partner. It specified Convergent's investment goal as an "annual rate of return of at

---

[9] Ellrich testified that he merely identified Convergent Market Funds (Convergent) for his clients as an option for them to consider, and that he informed Hays that he could not advise her whether to invest in Convergent because it would create a conflict of interest where he was Convergent's investment advisor. But the trial judge credited Hays's testimony regarding the conversation she had with Ellrich, finding that "Ellrich did more than neutrally recite 'options' Hays could consider."

least 30%," and explained that its investment strategy involved actively trading stock-indexed investments in an attempt to time the rise and fall of the stock market. It stated that neither MFA nor EHCP "have operated a partnership with the same objectives and portfolio strategy as" Convergent, and that Convergent "was a newly-formed entity with no history of operating performance." It also identified investment risks "associated with [Convergent's] proposed activities," including risks associated with short selling, the use of leverage, and the concentration of capital in single investments, industries, or sectors. Under the heading "Eligible Investors," the offering memorandum explained that "[i]nvestors generally . . . , if natural persons, must (i) have a net worth of at least $1 million or (ii) income of at least $250,000 or (iii) entities with assets of at least $5 million." Under the heading "Suitability," the offering memorandum declared:

> "Prospective investors should carefully evaluate whether an investment in [Convergent] is suitable for their particular circumstances and investment needs. In doing so, they should consult with such legal, tax, and financial advisors as they consider appropriate, and should avail themselves of the opportunity to ask questions of the [g]eneral [p]artner."

It also declared that "each investor should have sufficient funds, beyond those he or she intends to invest in [Convergent], to meet personal needs and contingencies."

The materials Hays received from EHCP also included an investor questionnaire, which Hays filled out following a telephone conversation with Ellrich during which she asked Ellrich how to answer certain questions. By signing the investor questionnaire, Hays accepted certain terms and conditions, including that she "ha[d] carefully reviewed the . . . [o]ffering [m]emorandum," and was "able to bear the economic risks associated with this investment."[10] Hays submitted the investor questionnaire to EHCP in December, 2000, and soon after, EHCP determined that she was an "eligible investor."[11]

In January, 2001, Hays transferred all of her funds from her Rydex and Profunds accounts from MFA to Convergent, investing $381,354.80 in Convergent in total. Following Hays's investment, Ellrich continued to send her written reports on her

---

[10] These risks "include[d] the likelihood that [the] investment [would] not generate current income or distributions even if [Convergent were] successful, and the possibility that some or all of the amount invested [would] be lost if [Convergent were] not successful."

[11] In the investor questionnaire, Hays stated that her "[a]pproximate current portfolio value" was $500,000. Hays did not complete the section of the investor questionnaire asking whether she had relied on a "purchaser representative."

net worth and portfolio holdings (now including her Convergent holding) as he had done previously.[12]

From January, 2001, to June, 2001, Hays's investment in Convergent declined in value by approximately seventeen per cent. Hays was aware of this decline at the time. In the period from 2001 to 2002, Ellrich spoke with Hays one-half dozen times by telephone, reassuring her that the market was by nature volatile but would correct itself eventually. In these conversations, Ellrich did not distinguish between Hays's Convergent investments and her Fidelity investments (which MFA continued to manage for Hays), and did not tell her that he could not advise her regarding her investment in Convergent. Both the stock market and the value of Hays' investment in Convergent continued to decline throughout 2002. Although Hays was concerned, she "didn't do anything" because she trusted Ellrich.

In April, 2003, after an overstatement by U.S. Bank of the balance in Convergent's accounts, Ellrich discovered that Convergent's net asset value was "approximately $0," with the result that Convergent became insolvent. In September, 2003,

---

[12] Following her investment with Convergent, Hays also periodically received a separate "Statement of Benefits" from Ellrich. In 2002, Hays stopped receiving any written statements from Ellrich, who began reporting Hays's balances to her by telephone, with Ellrich claiming that personal difficulties prevented him from preparing written statements.

Ellrich telephoned Hays and told her that a banking error had caused a total loss of Convergent's value. Ellrich also told Hays that an investigator from the securities division of the Secretary of the Commonwealth would be contacting her. Ellrich told her that he was working to recover the lost money, and that it was only a matter of time before he could do so. Although Hays believed him, she began "to prepare for [her] future based on no funds" by seeking employment in the real estate field, where she began working in 2005.[13] Hays filed this action against Ellrich and MFA in the Superior Court on September 11, 2006.

Discussion. 1. "Seller" liability. Under the Massachusetts Uniform Securities Act, G. L. c. 110A, § 410 (a) (2), a sale of securities in Massachusetts may be rescinded if the person who "offers or sells a security" misleads the buyer by making an untrue statement of a material fact or by failing to state a material fact, unless the seller proves that he or she did not know of the untruth or omission and in the exercise of reasonable care could not have known.[14]

---

[13] In late 2003 and early 2004, when Hays asked Ellrich about her situation, Ellrich offered to trade for her on the futures market, but Hays declined. He also told her that her interests were being represented in a class action that Ellrich was bringing in Federal court against U.S. Bank, but Hays did not recover anything from that lawsuit.

[14] The full text of G. L. c. 110A, § 410 (a) (2) states:

See Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 52

(2004). Ellrich[15] argues that he cannot be liable under the act

because he neither offered nor sold Convergent securities to

Hays.

Not all who solicit the purchase of securities are

"sellers" under the act, nor are they all "sellers" under

§ 12(a)(2) of the Securities Act of 1933 (Federal act), 48 Stat.

74, codified at 15 U.S.C. § 77l (2012) -- which is the Federal

counterpart to § 410 (a) (2) of the act.[16] Neither Congress nor

---

"Any person who . . . offers or sells a security by means
of any untrue statement of a material fact or any omission
to state a material fact necessary in order to make the
statements made, in the light of the circumstances under
which they are made, not misleading, the buyer not knowing
of the untruth or omission, and who does not sustain the
burden of proof that he did not know, and in the exercise
of reasonable care could not have known, of the untruth or
omission, is liable to the person buying the security from
him, who may sue either at law or in equity to recover the
consideration paid for the security, together with interest
at six per cent per year from the date of payment, costs,
and reasonable attorneys' fees, less the amount of any
income received on the security, upon the tender of the
security, or for damages if he no longer owns the security.
Damages are the amount that would be recoverable upon a
tender less the value of the security when the buyer
disposed of it and interest at six per cent per year from
the date of disposition."

[15] For convenience, because Ellrich is the sole owner and
operator of MFA, we refer to both appellants as "Ellrich" here
and throughout the discussion section except where the context
indicates otherwise.

[16] As we discuss further in part 2, infra, we consider
Federal law here because the Legislature has directed us to

the Legislature intended to impose rescission "on a person who urges the purchase but whose motivation is solely to benefit the buyer" of the security. Pinter v. Dahl, 486 U.S. 622, 647 (1988). See Stolzoff v. Waste Sys. Int'l, Inc., 58 Mass. App. Ct. 747, 766 n.21 (2003). Under both of these statutes, a person "offers or sells a security" if he "successfully solicits the purchase motivated at least in part by a desire to serve his own financial interests or those of the securities owner." Id., quoting Adams v. Hyannis Harborview, Inc., 838 F. Supp. 676, 686 (D. Mass. 1993), aff'd in part sub nom. Adams v. Zimmerman, 73 F.3d 1164 (1st Cir. 1996). See Pinter, supra at 647.

Ellrich does not deny that he solicited Hays's purchase of Convergent securities, but he nonetheless argues that he cannot be deemed a seller under the act because he had no "financial interest" in Hays's purchase. In support of this argument, Ellrich notes that he did not receive a commission for Hays's purchase of Convergent securities; nor did he receive any other compensation directly tied to the sale of securities to Hays. He also notes that the rate he earned as Convergent's investment advisor -- 1.25 per cent per year of Convergent's net asset

---

"coordinate the interpretation and administration of [G. L. c. 110A] with the related federal regulation." G. L. c. 110A, § 415.

value -- was less than the 1.75 per cent he earned on Hays's retirement funds before she invested them in Convergent.[17]

Ellrich's argument fails because the judge found that Ellrich solicited Hays to purchase Convergent securities "motivated at least in part by a desire to serve [his] own financial interests," and we conclude that her finding is not clearly erroneous. Although "personal financial gain is clearest in cases where the defendant receives a commission or other direct remuneration from the sale," we agree with the "many courts [that] have taken a more expansive view of financial gain that includes increased compensation tied to share price or company performance." In re OSG Sec. Litig., 971 F. Supp. 2d 387, 404 & n.119 (S.D.N.Y. 2013). Here, Ellrich earned an investment advisory fee from Convergent that was calculated based on the net asset value of Convergent funds. Although his fee percentage from Hays's retirement funds was lower at Convergent than it had been at MFA, the judge found that Ellrich viewed Convergent as an "opportunity" for him in part because he expected that, if Convergent proved viable, Furber would solicit additional investments that would ultimately increase Convergent's net asset value and,

---

[17] Although Ellrich's investment management fee was three per cent per year of Convergent's net asset value, he was responsible for paying "sub-advisory fees" totaling approximately 1.75 per cent per year of Convergent's net asset value, leaving him only 1.25 per cent.

consequently, Ellrich's advisory fees.  In short, Ellrich was motivated at least in part by the potential for a long-term increase in his investment advisory fees if he could raise the funds necessary to launch Convergent as a hedge fund.[18]  Cf. In re Vivendi Universal, S.A. Sec. Litig., 381 F. Supp. 2d 158, 187 (S.D.N.Y. 2003) (defendant was seller of company's securities where his bonuses were tied to company's increased earnings); In re OSG Sec. Litig., supra at 404-405 (pleadings adequately alleged that defendants were sellers of company's securities where plaintiffs alleged that "the survival of the [c]ompany was at stake," and that defendants' solicitation was motivated by desire to keep their positions and salaries).[19]  The judge,

---

[18] Convergent's offering memorandum declared that the partnership was "seeking to raise Invested Capital in the minimum amount of $15,000,000," which it characterized as the "Minimum Offering."

[19] Ellrich's reliance on Cohen v. State St. Bank & Trust Co., 72 Mass. App. Ct. 627 (2008), is misplaced.  In that case, the plaintiff contended that his investment manager had made false statements and omitted material facts when the manager transferred the plaintiff's funds from one State Street investment account to two State Street subaccounts.  See id. at 629, 635.  The Appeals Court affirmed the motion judge's ruling that State Street was not a "seller" under the act and the consequent grant of summary judgment for the defendants, because there was no evidence that the transfer of funds in any way affected the amount of investment management fees that State Street earned from the account.  See id. at 635 & n.12.  Here, by contrast, Ellrich's management fee was based on the net asset value of all of Convergent's accounts, not just the value of Hays's accounts, so he was motivated to urge her to transfer her funds to Convergent as part of his effort to reach the minimum offering amount and preserve the possibility that Convergent

therefore, did not err in finding that Ellrich's solicitation of Hays to purchase Convergent securities made him a seller under the act.

2. Statute of limitations. Ellrich contends that Hays's claim under § 410 (a) (2) of the act, filed in September, 2006, was not timely in light of the four-year limitations period in § 410 (e), which provides, "No person may sue under this section more than four years after the discovery by the person bringing the action of a violation of this chapter." Ellrich contends that the limitations period began to run in December, 2000, when Hays received Convergent's offering memorandum and signed the agreement to become a limited partner (which included the representation that she had "received and read" the relevant agreements). Relying on dictum in Marram, 442 Mass. at 54 n.20, quoting Kennedy v. Josephthal & Co., 814 F.2d 798, 802-803 (1st Cir. 1987), Ellrich contends that the limitations period in § 410 (e) begins to run when the plaintiff is put on "inquiry notice" of the violation, and he contends that the information in the offering memorandum put Hays on "inquiry notice" in December of 2000 that the investment was unsuitable for her, because "inquiry notice" occurs when "a reasonable investor would have noticed something was 'amiss,' e.g., when [she]

would attract assets from sources other than his former investment clients and thereby substantially increase his investment management fees.

obtained a prospectus."  In Marram, however, the defendant who solicited the plaintiff to invest in his hedge fund did not owe the plaintiff a fiduciary duty; Ellrich, as Hays's investment advisor, did owe her such a duty.  And in determining when the statute of limitations clock begins to run, that makes all the difference.

Under the "fraudulent concealment" doctrine, codified at G. L. c. 260, § 12, "[i]f a person liable to a personal action fraudulently conceals the cause of such action from the knowledge of the person entitled to bring it, the period prior to the discovery of his cause of action by the person so entitled shall be excluded in determining the time limited for the commencement of the action."  We have interpreted this statute to mean that "[w]here a fiduciary relationship exists, the failure adequately to disclose the facts that would give rise to knowledge of a cause of action constitutes fraudulent conduct and is equivalent to fraudulent concealment for purposes of applying § 12."  Demoulas v. Demoulas Super Mkts., Inc., 424 Mass. 501, 519 (1997), S.C., 428 Mass. 543 (1998), and S.C., 432 Mass. 43 (2000).  See Doe v. Harbor Sch., Inc., 446 Mass. 245, 254-255 (2006); Patsos v. First Albany Corp., 433 Mass. 323, 328-329 (2001); Puritan Med. Ctr., Inc. v. Cashman, 413 Mass. 167, 175 (1992), and cases cited.  In these cases, the statute of limitations clock begins to run only when the plaintiff has

"'actual knowledge' . . . of the facts giving rise to his causes of action," i.e., the facts which the fiduciary had failed to disclose. Patsos, supra at 329 n.11. See Crocker v. Townsend Oil Co., 464 Mass. 1, 9 (2012) ("the statute of limitations begins to run when the plaintiff has actual knowledge of the wrong giving rise to his cause of action"); Doe, supra at 254-255, quoting Akin v. Warner, 318 Mass. 669, 675 (1945) (limitations clock for tort claim alleging breach of fiduciary duty begins to run only when plaintiff has "'actual knowledge' that she has been injured by the fiduciary's conduct," which occurs "[o]nly when the beneficiary's harm at the fiduciary's hands has 'come home' to the beneficiary"); Demoulas, supra. Therefore, under the fraudulent concealment doctrine, "inquiry notice" of a violation by a seller of securities is not enough to start the limitations clock running when the seller owes a fiduciary duty to the purchaser.

This does not mean that the limitations clock begins only when the plaintiff understands that she has a legal claim, that is, when she realizes that the defendant has violated a law that entitles her to sue to recover damages. Doe, supra at 256-257. Rather, the clock begins when the plaintiff has "actual knowledge" of the wrong committed by the fiduciary, rather than "knowledge of the consequences of that [wrong] (i.e., a legal claim against the fiduciary)." Id.

Ellrich contends that the actual knowledge standard should not govern when the limitations clock starts to run for claims under the act, and that we should instead apply the Federal standard governing when the limitations clock starts to run for claims under § 12(a)(2) of the Federal act. As Ellrich correctly notes, G. L. c. 110A, § 415, provides, "This chapter shall be so construed as to effectuate its general purpose to make uniform the law of those states which enact it and to coordinate the interpretation and administration of this chapter with the related federal regulation." See Marram, 442 Mass. at 50 ("The Legislature has directed that we interpret the act in coordination with the [Federal act]"). We therefore examine the Federal standard and consider whether to apply it to the limitations period under the act.

Where the defendant is not the fiduciary of the plaintiff, the long-standing Federal rule of fraudulent concealment mirrors the Massachusetts rule. "Fraudulent concealment tolls the statute of limitations . . . even without affirmative acts on the part of the defendant unless the plaintiff, through reasonable diligence, discovered or should have discovered the fraud." Kennedy, 814 F.2d at 802. Compare with Passatempo v. McMenimen, 461 Mass. 279, 293-294 (2012), quoting Koe v. Mercer, 450 Mass. 97, 101 (2007) ("Under [the] discovery rule, the statute of limitations starts when the plaintiff [1] discovers,

or [2] reasonably should have discovered, that [he or she] has been harmed or may have been harmed by the defendant's conduct").  In determining when the limitations clock under the Federal act begins, two questions are asked relating to when the plaintiff "should have discovered the fraud."  The first is an "objective" question asking whether there were "sufficient storm warnings to alert a reasonable person to the possibility that there were either misleading statements or significant omissions involved in the sale."  Kennedy, supra, quoting Cook v. Avien, Inc., 573 F.2d 685, 697 (1st Cir. 1978).  See Maggio v. Gerard Freezer & Ice Co., 824 F.2d 123, 128 (1st Cir. 1987).  "'[S]torm warnings' . . . trigger a plaintiff's duty to investigate in a reasonably diligent manner," so the second, "more subjective" question asks whether "a plaintiff actually exercised reasonable diligence."  Id., quoting Cook, supra.  The existence of a fiduciary relationship is relevant only with respect to this second inquiry, and only as one of "the circumstances of the particular case, including the existence of a fiduciary relationship, the nature of the fraud alleged, the opportunity to discover the fraud, and the subsequent actions of the defendants."  Maggio, supra.

Federal courts have applied this two-part test to circumstances like those here, where unsophisticated investors received a prospectus that disclosed the risks of the

investment, and where the investors failed to make any inquiry into the risks of the investment because they relied on oral statements by the defendants that were contradicted or corrected by the prospectus. Federal courts have repeatedly held that receipt of the prospectus constitutes a "storm warning" even where the plaintiff was unsophisticated. See Dodds v. Cigna Sec., Inc., 12 F.3d 346, 350 (2d Cir. 1993), cert. denied, 511 U.S. 1019 (1994); Kennedy, 814 F.2d at 802-803 ("We are faced here with the great glowering clouds of the offering memorandum," where, "[f]or each oral representation that [the defendant] made and upon which appellants claim they relied, there was a direct refutation by the plain language of the offering memorandum"). Although "subjective" factors are relevant in applying the second part of the test, Federal courts have rejected the argument that unsophisticated plaintiffs' reliance on defendants excused the plaintiffs from reasonable diligence after storm warnings were present, even where the defendants had committed a breach of fiduciary obligations towards them. See Maggio, 824 F.2d. at 129 ("Even assuming that defendants owed plaintiff a fiduciary duty, . . . plaintiff's prolonged failure to investigate the possibility of fraudulent conduct in light of the abundant facts known to him . . . can hardly be characterized as due diligence"); Kravetz v. United States Trust Co., 941 F. Supp. 1295, 1303-1309 (D. Mass. 1996).

See also J. Geils Band Employee Benefit Plan v. Smith Barney
Shearson, Inc., 76 F.3d 1245, 1259-1260 (1st Cir.), cert.
denied, 519 U.S. 823 (1996), quoting Cook, 573 F.2d at 696 n.24
("Even assuming that [defendants] owed [plaintiffs] a fiduciary
duty, an investor 'must apply his common sense . . . in
determining whether further investigation is needed' . . . [and]
[w]hile we recognize, and are genuinely troubled by, the
possibility that the [plaintiffs] were such unsophisticated
investors that they were not in a position to heed the storm
warnings, . . . plaintiffs cannot shroud themselves in ignorance
or expect that their unsophistication will thoroughly excuse
their lack of diligence or failure, here, to even inquire").  In
short, under Federal law, where clients have invested in
securities based on the false statements or omissions of an
investment advisor who owes them a fiduciary duty, the clients
are still required to act with reasonable diligence if the
information in the prospectus suggests that their reliance on
the investment advisor may be misplaced, and the limitations
clock begins upon their failure to do so, even if they have no
actual knowledge that they had been misinformed.

     We decline to adopt this Federal standard as our own under
the act for two reasons.  First, the actual knowledge standard
recognizes the trust that an investor is entitled to place in a
fiduciary's advice regarding investment decisions.  See Doe, 446

Mass. at 255 ("[T]he actual knowledge standard recognizes the dependent status of the beneficiary vis-à-vis the fiduciary, and protects the beneficiary's legitimate expectation that the fiduciary will act with the utmost probity in all matters concerning the relationship"). It also recognizes that unsophisticated investors who are advised by their fiduciary that an investment is suitable for them are unlikely to read a prospectus with an eye towards testing the wisdom of that advice, especially where they might not understand the information that is relevant to such investment decisions and might not perceive the significance of "storm warnings." The argument that financial information in a prospectus addressed to sophisticated investors will alert the investor to the possibility that his or her fiduciary is untrustworthy, and should impose on the investor a duty to make an independent inquiry into the fiduciary's trustworthiness, is contrary to the relationship of trust implicit in any fiduciary relationship. See id. at 256 n.13 ("a beneficiary is entitled to approach [a fiduciary's representations] without skepticism . . . and is not required to ascertain the absence of foul play").

Second, although G. L. c. 110A, § 415, directs that courts "coordinate the interpretation and administration of this chapter with the related [F]ederal regulation," it does not mandate that courts adopt the interpretation of comparable

Federal securities statutes, especially where doing so would conflict with our interpretation of other Massachusetts statutes, such as G. L. c. 260, § 12, which codifies our fraudulent concealment doctrine. Moreover, the Legislature cannot have intended that the limitations period under the act would be the same as the limitations period under the Federal act where the Legislature provided Massachusetts plaintiffs a much more generous limitations period under the act (four years) than Congress provided under the Federal act (one year), and where the Legislature failed to impose the three-year statute of repose included in the Federal act. Compare G. L. c. 110A, § 410 (e), with 15 U.S.C. § 77m (2012).[20]

Applying the actual knowledge standard to the facts of this case, we conclude that where an investment advisor owes a fiduciary duty of disclosure to his or her client and violates the act by misleading the client regarding the suitability of an investment, Massachusetts law deems it fraudulent concealment for the fiduciary to fail to reveal to the client that the investment was not suitable, and the limitations clock begins to run only when the client has actual knowledge of the

---

[20] Title 15 U.S.C. § 77m (2012) provides, in relevant part, "No action shall be maintained to enforce any liability [under § 12(a)(2)] unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence," and, "In no event shall any such action be brought . . . more than three years after the sale."

unsuitability of the investment.  Here, the facts giving rise to Hays's cause of action under § 410 (a) (2) of the act are that Convergent was an unsuitable investment for Hays, and that Ellrich, as her fiduciary, failed to disclose to her its unsuitability in soliciting her to purchase Convergent securities.  Therefore, in the context of this case, the limitations clock for Hays began when she had actual knowledge of the unsuitability of Convergent securities -- for instance, knowledge that investing in Convergent was substantially riskier than the investments that Ellrich had previously made for her. The judge found that, even though the value of Convergent securities declined after Hays purchased them, "a reasonable client in Hays'[s] position could not have ascertained, without expert advisor advice, how the Convergent risk compared to the risks she had been taking historically, particularly in a volatile market."  Further, the judge found that "a reasonable investor in Hays'[s] position . . . could not reasonably have noticed that something (other than market forces) was amiss prior to, at the earliest, September, 2003," when Ellrich informed Hays that Convergent was insolvent and that an investigator from the securities division of the Secretary of the Commonwealth would be contacting her.[21]  We conclude that these findings are not clearly erroneous.

---

[21] The trial judge relied on Marram, 442 Mass. at 54 n.20,

Ellrich argues that Hays's action is time barred because Hays received Convergent's offering memorandum in December, 2000 (approximately six years before her action was filed), and the information in that offering memorandum contradicted the misrepresentations and corrected the omissions that the judge found that Ellrich had made.[22] It is true that a sophisticated investor who carefully read and considered the offering memorandum would have recognized that the investment was not suitable for a person in Hays's financial position. But a sophisticated investor in Hays's financial position who carefully read and considered the offering memorandum would also likely not have invested in Convergent. The fact that Hays did invest in Convergent supports the judge's finding that, despite having received the offering memorandum, she was not sophisticated enough to have actual knowledge of the unsuitability of the investment at the time she invested.

Ellrich alternatively contends that Hays had actual knowledge by June, 2001, when she knew that her investment in

in applying an "inquiry notice" standard to the issue whether Hays's statutory claim was timely, finding that Hays was not on inquiry notice of the statutory violation by Ellrich at any time prior to 2003. Although the trial judge did not apply an actual knowledge standard, as we do here, the judge implicitly found that Hays did not have actual knowledge before 2003 by finding that Hays was not on inquiry notice before 2003.

[22] Hays does not contend that the offering memorandum contained material misrepresentations or omissions.

Convergent had declined by approximately seventeen per cent in the first five months. But actual knowledge of an investment loss is not sufficient by itself to constitute actual knowledge that the fiduciary falsely represented the investment's suitability, especially when the loss comes at a time when the over-all stock market is declining. The knowledge required to commence the limitations clock is knowledge that she purchased Convergent securities based on a misrepresentation by Ellrich of their suitability for her, and, in essence, the judge found that this did not occur before September, 2003, when she learned that she had lost her entire investment in Convergent.

Ellrich also contends that his fiduciary relationship with Hays regarding her equity investments ended when she liquidated her Rydex and Profunds accounts and transferred those funds to Convergent. Once that occurred, he contends, his fiduciary duty extended only to her fixed income investments that she held with Fidelity. He supports this contention by arguing that, having become the investment advisor for Convergent, he could no longer serve as Hays's investment advisor regarding her equity investments, because his fiduciary duty to the general partner of Convergent would potentially be in conflict with a fiduciary duty to any limited partner investor in Convergent. There is no dispute that Ellrich served as her fiduciary for all her retirement funds when he advised her to invest in Convergent,

and when she signed the offering memorandum.  We need not address whether the actual knowledge standard applies to a claim against a person who once was a fiduciary but who subsequently terminated the fiduciary relationship, because the judge found (and the evidence supports her finding) that Ellrich did not explain to Hays his potential conflict of interest -- that is, he did not explain that "he would no longer be considering Hays'[s] individual needs with respect to those trades, and that he would no longer have any obligation to ensure that any of the securities purchased for the Convergent portfolio was an appropriate investment for Hays; and that [he] was no longer obliged to monitor for Hays the assets held by those funds." The judge further found, based on Ellrich's omissions and his conduct, that he "continued to provide advisory services to Hays, and accordingly Hays reasonably continued to trust [him] to do so."  In short, Ellrich's fiduciary relationship with Hays regarding the funds she invested in Convergent should have ended once she made that investment, but Ellrich never told her that it did, and she reasonably understood that he continued to serve as her investment advisor for these funds and continued to make market-timing investments on her behalf.

Because we embrace the actual knowledge standard where an investment advisor owes his or her client a fiduciary duty in determining when the limitations clock commences for claims

under the act, and because we conclude that the judge was not clearly erroneous in finding that Hays did not have actual knowledge of a violation of the act before 2003, we affirm the judge's finding that Hays timely filed her action under the act.

3.  Remaining claims on appeal.  We need not dwell long on Ellrich's remaining claims.  We reject his contention that the judgment against him should be vacated because it is contrary to the great weight of the evidence.  The evidence is more than sufficient to support the judge's finding that Ellrich's misrepresentations and omissions were material in that they strongly suggested that Convergent was a suitable investment for Hays to invest three-quarters of her retirement savings, where it was not.  Even if we were to accept Ellrich's argument that the offering memorandum contradicted or corrected all his false oral assertions and omissions, that would not negate the materiality of his oral statements.  "The test whether a statement or omission is material is objective:  'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'"  Marram, 442 Mass. at 57-58, quoting Craftmatic Sec. Litig. v. Kraftsow, 890 F.2d 628, 641 (3d Cir. 1989).  The judge did not err in finding that, given the long-standing relationship of trust between Ellrich and Hays, Hays reasonably

viewed Ellrich's advice regarding the suitability of the Convergent investment as significantly altering the "total mix" of information available to her.  Cf. Marram, supra at 48, 55-59 (claim under act alleging false oral statements regarding suitability of investment survived motion to dismiss even though subscription agreement included integration clause that stated that it superseded all prior understandings, written or oral).

The evidence is also sufficient to support the judge's finding that Convergent was an unsuitable investment for Hays based on the expert testimony regarding the unsuitably high risk posed by investing in a hedge fund such as Convergent, and the offering memorandum's statements that eligible investors -- unlike Hays -- should have had a net worth of at least $1 million, an income of at least $250,000, or entities with assets of at least $5 million, and should have had sufficient funds apart from those invested in Convergent to meet personal needs and contingencies.[23]

---

[23] We need not consider Ellrich's claim that the judge abused her discretion in denying Ellrich's motion to set aside the default earlier entered against him, where the judge made findings of fact and law as if he were not a defaulted party, and these findings provide an adequate and independent ground for the judgment against him.  Nor need we consider whether the judge's allowance of the common-law claims would independently support the award of rescissionary damages where those damages were awarded under the act, and the judge did not award any damages beyond those available under the act.

Conclusion.  For the foregoing reasons, the judgment in favor of Hays against Ellrich and MFA is affirmed.

So ordered.